UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RINALDYS CASTILLO, *individually and on behalf of all others similarly situated,*

                                        Plaintiff,

                -v-

ALBERT EINSTEIN COLLEGE OF MEDICINE, INC.,
MONTEFIORE HEALTH SYSTEMS, INC.,
MONTEFIORE MEDICAL CENTER, *and* MONTEFIORE
MEDICINE ACADEMIC HEALTH SYSTEM, INC.

                                        Defendants.

24 Civ. 984 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Rinaldys Castillo brings this action on behalf of himself and similarly situated persons, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New York Labor Law ("NYLL"), §§ 190, 650 *et seq.* He claims that defendants Montefiore Health Systems, Inc., Montefiore Medical Center, and Montefiore Medicine Academic Health System, Inc. (collectively, the "Montefiore defendants"), and the Albert Einstein College of Medicine, Inc. (the "College") failed to pay study and research coordinators (collectively, "coordinators") for hours worked in excess of 40 hours per week. Salient here, he claims that defendants misclassified coordinators as employees exempt from overtime pay under the FLSA.

On July 11, 2024, defendants moved to dismiss Castillo's Amended Complaint ("AC"), Dkt. 22, under Federal Rule of Civil Procedure 12(b)(6), on the ground that the Montefiore defendants do not qualify as "employers" under the FLSA and NYLL. Dkt. 29 at 5–15.[1] On

---

[1] Defendants moved, in the alternative, to strike portions of the AC under Federal Rule of Civil Procedure 12(f). Dkt. 29 at 16–18. The Court denied that motion. Dkt. 35 at 10–12.

March 4, 2025, the Court denied defendants' motion to dismiss, finding the AC to adequately plead that the Montefiore defendants and the College are joint employers under both statutes. Dkt. 35 ("MTD Decision") at 7–10. In April 2025, the parties commenced discovery. Dkt. 115.

Castillo now moves, under 29 U.S.C. § 216(b), for (1) conditional certification of an FLSA collective consisting of coordinators currently or formerly employed by defendants who were not compensated for overtime; (2) equitable tolling of the FLSA statute of limitations period; and (3) authorization for notice to defendants' current and former employees dating back three years from the filing of the AC. For the reasons that follow, the Court denies Castillo's motion.

## I.    Background

### A.    Factual Background

The Court incorporates by reference the facts recounted in the MTD Decision. *See* MTD Decision at 1–3. The following summary—supplemented by additional allegations in the declarations and exhibits offered in connection with the conditional certification motion— focuses on the factual allegations necessary to resolve the limited issues presented.

The College is a medical school located in the Bronx, New York. AC ¶ 10. Montefiore Medical Center ("MMC") is a "premier academic medical center and teaching hospital" affiliated with the College. *Id.* ¶ 13. In 2015, MMC's parent corporation, Montefiore Health Systems, Inc. ("MHS"), "assumed operational authority and responsibility for the College." *Id.* ¶¶ 12, 16 (cleaned up). Montefiore Medicine Academic Health Systems, Inc. ("MMAH") is the "corporate parent and umbrella organization for the College and MHS." *Id.* ¶ 11. Between

them, the College and Montefiore defendants employ more than 2,000 full-time staff members in research positions. *Id.* ¶ 2.[2]

The College currently has more than 850 active clinical and non-clinical research projects. Dkt. 95 ("Ramirez Decl.") ¶ 4. These are administered through the College's 30 academic departments, 10 centers of excellence, eight research centers, and six programs of distinction. *Id.* Within each academic department, there may be multiple studies ongoing at once. *Id.* Each study is overseen by one or more principal investigators ("PIs"). *Id.* ¶ 7. PIs are responsible for determining whether a coordinator is needed on a given study (and, if so, how many) and supervising the coordinators whom they hire. *Id.*[3]

Castillo was employed by defendants as a study coordinator in the Cognitive Neurophysiology Laboratory from approximately 2021 through 2023. Dkt. 75 ("Castillo Decl.") ¶ 2. His duties included scheduling visits for study participants, collecting and entering study data, assisting with regulatory documentation, and preparing for participant sessions. *Id.* ¶ 3. Castillo alleges that he generally worked at least 41 to 44 hours per week, AC ¶ 9, but was "never paid overtime or any premium pay for working beyond [40] hours," Castillo Decl. ¶ 6. He alleges that this failure to pay overtime was due to defendants' systematic misclassification of him and other coordinators as overtime-exempt employees under the FLSA. AC ¶ 32.

---

[2] Because the Court found the AC to have plausibly pled the Montefiore defendants and the College are joint employers, MTD Decision at 7–10, the Court does not distinguish between those entities in certain background references. The Court does so distinguish in describing the organizational structure of which study and research coordinators are a part, because such is germane to this motion.

[3] The parties appear to agree that any differences between study and research coordinators are minor. *See* Mot. at 4; Opp'n at 1. Accordingly, the Court does not distinguish between the two positions in its analysis.

Castillo brings a claim for unpaid overtime wages under the FLSA on behalf of himself and other similarly situated research and study coordinators who are currently, or were formerly, employed by defendants. Dkt. 79 ("Mot.") at 2. He seeks conditional certification of the following collective:

> All persons who were/are employed by Defendants as "Study Coordinators" and/or similar positions, such as "Research Coordinators," during the past three years prior to the commencement of this action through the present . . . who were/are not paid overtime at a rate of one and one-half times their regular rate for all hours worked in excess of 40 hours per workweek . . . .

AC ¶ 50.

## B.    Procedural History

On February 9, 2024, Castillo filed this action. Dkt. 1. On April 26, 2024, defendants moved to dismiss. Dkt. 19. On April 29, 2024, the Court ordered Castillo either to amend the complaint or oppose the motion. Dkt. 21. On May 17, 2024, Castillo filed the AC, the operative complaint today. Dkt. 22. On July 11, 2024, defendants moved to dismiss the AC under Rules 12(b)(6) and 12(f). Dkt. 29. On March 4, 2025, the Court denied that motion. Dkt. 35.

On April 21, 2025, the Court approved the parties' case management plan, which set a deadline of August 15, 2025 for Castillo's conditional certification motion and February 18, 2026 for the close of fact discovery. Dkt. 48. On July 23, 2025, the Court granted Castillo's request for a three-month extension of the conditional certification deadlines to enable further discovery to be completed. Dkts. 63–64.

On November 17, 2025, Castillo filed a motion for conditional certification, Dkt. 79, along with supporting declarations and exhibits, Dkt. 87. On January 22, 2026, Castillo sought leave to supplement the record with the declaration of a former study coordinator and to redact the declarant's name and designate it as attorneys' eyes only. Dkt. 90.

On January 27, 2026, defendants opposed the motion for conditional certification, Dkt. 93 ("Opp'n"), with supporting exhibits and declarations, Dkts. 94–98. Defendants also opposed Castillo's request to supplement the record. Dkt. 99.

On February 2, 2026, the Court granted Castillo leave to supplement the record with the employee's declaration and redact the declarant's name on the public docket of the case, but denied Castillo's request to designate the declarant's identity attorney's eyes only. Dkt. 100.

On February 10, 2026, Castillo replied in further support of the motion, Dkt. 104 ("Reply"), and filed the supplemental declaration, Dkt. 101 ("E.M. Decl.").

On February 13, 2026, defendants moved for leave to file a sur-reply to address the supplemental declaration, Dkt. 105, and on February 17, 2026, the Court granted that motion, Dkt. 106. On February 20, 2026, defendants filed the sur-reply, Dkt. 107 ("Sur-Reply"), and supporting declarations, Dkts. 108–09.

On March 6, 2026, the Court directed Castillo, to assist the Court in resolving the conditional certification motion, to file a letter on the docket summarizing the discovery he sought and received before filing the motion. Dkt. 112. On March 11, 2026, Castillo did so. Dkt. 115 ("Discovery Ltr.").

That same day, the parties filed a joint letter stating their intention to conduct a private mediation and requesting a stay of all deadlines pending mediation. Dkt. 114. On March 12, 2026, the Court granted a stay of all deadlines related to defendants' anticipated motion for summary judgment.[4] Dkt. 116. The Court, however, stated its intention to resolve Castillo's pending conditional certification motion.

---

[4] On March 4, 2026, defendants filed pre-motion letters stating their intention to move for summary judgment as to all claims in the AC. Dkts. 110–11.

## II.    Governing Legal Framework

### A.    The FLSA and Exemptions

The FLSA requires, in relevant part, that "employees who work more than forty hours per week be compensated for those excess hours at a higher rate." *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 (2d Cir. 2020) (citing 29 U.S.C. § 207(a)(1)).  Certain classes of employees, however, are excluded from this overtime-pay requirement.  Salient here, § 207 "shall not apply with respect to any employee employed in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1).  The FLSA authorizes the Secretary of Labor (the "Secretary") to "define[] and delimit[]" the scope of that exemption. *Id.*

The professional exemption applies to both "learned" and "creative" professionals.  29 C.F.R. §§ 541.301 ("learned professional exemption"), 541.302.  As to the former, at issue here, the Secretary's regulations provide that a learned professional is "any employee whose primary job duty requires 'knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.'" *Isett*, 947 F.3d at 128 (quoting 29 C.F.R. § 541.300(a)(2)(i)).  For an employee to qualify for the learned professional exemption, the employer must show (1) that his work requires "advanced knowledge" (2) "in a field of science or learning," and that (3) such advanced knowledge is "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a).

### B.    Collective Action Certification

The FLSA provides that an action "may be maintained against any employer . . . by any one or more employees for and in [sic] behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  "[T]o be 'similarly situated' means that named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020).  In other words, "party

6

plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.*

A FLSA collective "differs from a [Federal Rule of Civil Procedure] 23 class because plaintiffs become members of the collective only after they affirmatively consent to join it." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016). District courts "have discretion, in appropriate cases, to implement § 216(b) by facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (cleaned up).

The Second Circuit has "endorsed a two-step process for certifying FLSA collective actions:"

> At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law. At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs.

*Glatt*, 811 F.3d at 540 (citing *Myers*, 624 F.3d at 555). The present motion concerns the first step.

### III.     Discussion

#### A.     Applicable Standard of Proof

Generally, to prevail on a motion for conditional certification, plaintiffs need only "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.)). Such is a "low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Id.* (emphasis in original) (quoting *Hoffman*, 982 F. Supp.

at 261). But "the burden is not non-existent and the factual showing, even if modest, must still be based on some substance." *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010). Courts generally assess whether conditional certification is appropriate "based on the pleadings, affidavits, and declarations submitted by the plaintiff." *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 480 (S.D.N.Y. 2016) (citation omitted).

Where substantial discovery has been completed by the time a conditional certification motion is made, however, many courts in this Circuit apply a "modest plus" standard of review. *See id.* at 482 (efficiency interests support a certification inquiry that "grow[s] more exacting as discovery proceeds"). Under that more searching standard, courts "look beyond the pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties, albeit with an understanding 'that the body of evidence is necessarily incomplete.'" *Id.* (citation omitted); *see also Tay v. New York & Presbyterian Hosp.*, No. 22 Civ. 8379, 2024 WL 4286226, at *6 (S.D.N.Y. Sept. 24, 2024) ("The difference between the original and 'modest-plus' standards is whether the court considers only the pleadings and attached documents, or those documents *plus* the defendant's opposing materials." (emphasis in original) (citation omitted)). Such additional evidence "should show that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs—in other words, that Plaintiffs have, through discovery, advanced the ball down the field." *Korenblum*, 195 F. Supp. 3d at 482 (cleaned up). As under the modest initial stage review, however, courts "do not resolve factual disputes, decide ultimate issues on the merits, or make credibility determinations." *Id.* at 480.

Defendants argue that modest plus review is warranted here because the parties have engaged in pre-certification discovery. Opp'n at 11. Castillo argues for the modest factual showing standard. Reply at 9–10.

The Court finds application of the modest plus standard warranted. Discovery has been ongoing since April 2025. *See* Dkt. 48. In May and July 2025, defendants served responses to Castillo's interrogatories and requests for production.[5] Discovery Ltr. at 1–2. On July 22, 2025, the Court granted Castillo a three-month extension of the conditional certification deadlines to enable further discovery bearing on that motion. Dkt. 63. In October 2025, Castillo conducted two Rule 30(b)(6) depositions of defendants' representatives. Discovery Ltr. at 3. Although discovery bearing on conditional certification was not complete by the time Castillo filed the instant motion in November 2025, it was well underway. The Court thus finds that "neither law nor logic supports rigidly applying the same standard of review" as in a case where discovery has not yet, or barely, begun. *Korenblum*, 195 F. Supp. 3d at 481–82; *see also Tay*, 2024 WL 4286226, at *7 ("If the Court were to decide this motion on the basis of the pleadings and declarations alone, . . . what would be the point of the discovery on the question of conditional certification?" (cleaned up)).

Accordingly, the Court will consider evidence from both parties in resolving Castillo's conditional certification motion. *See, e.g., Korenblum*, 195 F. Supp. 3d at 478–79 (applying modest plus review "after roughly three months of discovery limited to issues bearing on preliminary certification," which included taking Rule 30(b)(6) depositions (cleaned up)); *Brown v. Barnes & Noble, Inc.*, No. 16 Civ. 7333, 2019 WL 5188941, at *2 (S.D.N.Y. Oct. 15, 2019) (same after "six months of discovery targeted to conditional certification" (citation

---

[5] Castillo states that these responses were deficient in that defendants failed to provide substantive answers, withheld relevant documents, and refused to produce electronically stored information. Discovery Ltr. at 1–2. It appears that many of these deficiencies were addressed after the Court's interventions on June 30, 2025, Dkt. 53, and July 23, 2025, Dkt. 64, but Castillo's letter elides that point. In any event, Castillo's allegation that defendants have not been fully responsive does not undermine the efficiency interests supporting considering the evidence adduced in discovery thus far.

omitted)); *Martinez v. Elegante Servs., Inc.*, No. 24 Civ. 2058, 2025 WL 3281405, at *3 (S.D.N.Y. Nov. 25, 2025) (same after "approximately a year of discovery," which included exchanging "paystubs, timesheets, interrogatories, and declarations pertaining to the collective").

The Court will not consider, however, the declarations, offered by defendants, of three study coordinators whom they currently employ. Dkts. 96–98. Those declarations raise factual disputes as to whether certain employees, including a coordinator whom Castillo's declaration references, worked overtime and exercised discretion. Such allegations are improper to consider at the conditional certification stage, where courts may not "make credibility determinations." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 158 (S.D.N.Y. 2014) (citation omitted). In addition, Castillo has not yet deposed these declarants, and, because they are current employees of defendants, their testimony is "of limited evidentiary value in the FLSA context because of the potential for coercion." *Amador v. Morgan Stanley & Co.*, No. 11 Civ. 4326, 2013 WL 494020, at *8 (S.D.N.Y. Feb. 7, 2013) (declining to "weigh competing declarations" at first stage of conditional certification, where plaintiffs "have not had an opportunity to depose these declarants" (citation omitted)). The Court thus does not take into account defendants' employee declarations in its analysis.

### B.    The "Similarly Situated" Standard

At the initial stage of the conditional certification process, the Court must consider whether potential collective members exist who are "'similarly situated' to the named plaintiff[] with respect to whether a FLSA violation has occurred." *Myers*, 624 F.3d at 555. The Court accordingly must assess whether the named plaintiff and potential plaintiffs "were victims of a common policy or plan that violated the law." *Id.* (citation omitted). Although "the proposed collective need not be 'identical in every possible respect,' its potential members must be similarly situated with respect to the allegedly unlawful policy or practice.'" *Korenblum*, 195 F.

Supp. 3d at 479 (quoting *Chowdhury v. Duane Reade, Inc.*, No. 6 Civ. 2295, 2007 WL 2873929, at *5 (S.D.N.Y. Oct. 2, 2007)).

For a plaintiff claiming misapplication of a FLSA exemption to show an unlawful policy, it is not enough for him to "point[] to the fact that the employer has classified all employees in a particular job category as exempt." *Costello v. Kohl's Illinois, Inc.*, No. 13 Civ. 1359, 2014 WL 4377931, at *4 (S.D.N.Y. Sept. 4, 2014); *see also Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) ("*Brown I*"); *Jenkins v. TJX Cos. Inc.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012). Rather, the plaintiff must show that (1) "there are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions" (2) who "are classified as exempt pursuant to a common policy or scheme." *Myers*, 624 F.3d at 555 (cleaned up). Although defendants bear the burden of proving the applicability of an exemption at the merits phase of the litigation, *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009), "the legal standard governing the [] exception is relevant" at the conditional certification stage because plaintiffs must show "that they were victims of a common policy or plan that *violated the law*," *Fraticelli v. MSG Holdings, L.P.*, No. 13 Civ. 6518, 2014 WL 1807105, at *2 (S.D.N.Y. May 7, 2014) (emphasis in original) (citation omitted).

As described above, the learned professional exemption applies to employees whose primary duty is the performance of work requiring (1) "advanced knowledge" (2) "in a field of science or learning," and that (3) such advanced knowledge is "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). It is undisputed that coordinators worked in a field of science or learning; the parties' disagreement on this point turns on the first and third elements. As to the first, work requiring "advanced knowledge" is defined as "work which is predominantly intellectual in character, and which

11

includes work requiring the consistent exercise of discretion and judgment." *Id.* § 541.301(b).
As to the third, "[s]pecialized intellectual instruction" refers to "specialized academic training," *id.* § 541.301(d)—a "bachelor's degree in a germane field suffices." *Pippins v. KPMG, LLP*, 759 F.3d 235, 250 (2d Cir. 2014).

### C.    Analysis

Castillo argues that he is similarly situated to the hundreds of other coordinators employed by defendants during the relevant three-year period.  He argues that he has made a substantial showing that (1) neither his nor the other coordinators' primary duties or job requirements qualified them for an FLSA exemption, and (2) he and the other coordinators were not paid overtime for hours worked over 40 in a week.  Mot. at 9.

It is undisputed that all research and study coordinators were classified by defendants as exempt under the learned professional exemption and thus not compensated for any overtime hours worked.  *See, e.g.*, Mot. at 11; Opp'n at 15.[6]  But that common practice "is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members . . . 'similarly situated.'"  *Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10 Civ. 8820, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) (citation omitted).  Rather, Castillo must be able to show that defendants were uniformly *mis*classifying coordinators as learned professionals.  *Lock v. Costco Wholesale Corp.*, No. 23 Civ. 7904, 2025 WL 964148, at *6 (E.D.N.Y. Mar. 31, 2025).  The question therefore turns on whether potential plaintiffs

---

[6] Defendants dispute that all putative collective members worked overtime hours.  Opp'n at 18–20.  Because the Court finds conditional certification improper on the ground that Castillo and the putative class members are not similarly situated with respect to their job duties and requirements, the Court does not have occasion to address whether they are similarly situated with respect to overtime hours.

exist who are similarly situated to Castillo with respect to their duties and job requirements—the factors that bear on application of that exemption.[7]

To show that he and the other coordinators had substantially similar duties and requirements, Castillo relies principally on: (1) two declarations (his and that of another coordinator); (2) six job descriptions of coordinator positions; and (3) the deposition testimony of Yvonne Ramirez, the College's vice president of human resources. The Court reviews each in turn, considering defendants' contrary evidence where relevant.

### 1.    Declarations of Castillo and E.M.

In his declaration, Castillo states that his work consisted of scheduling participant visits, conducting and recording testing sessions, collecting and entering study data, maintaining research materials, assisting with regulatory documentation, communicating with investigators and families, preparing for participant sessions, and setting up equipment. Castillo Decl. ¶ 3. He states that he worked in the same laboratory wing as three other study coordinators, whom he names, and personally observed them performing similar duties. *Id.* ¶¶ 7–8. He states that he had nearly daily conversations with these co-workers, while setting up equipment, eating lunch, or wrapping up at the end of the day, in which they would discuss their work and hours. *Id.* ¶ 9. He states that he attended departmental meetings, appreciation events, and informal gatherings

---

[7] Defendants argue that many coordinators also qualify for the administrative and combination exemptions, supplying an additional reason why the members of the putative collective are not similarly situated. Opp'n at 15. The administrative exemption applies to employees whose primary duty "is the performance of office or non-manual work directly related to the management or general business operations of the employer" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. The combination exemption applies to employees "who perform a combination of exempt duties." *Id.* § 541.708. Defendants appear to have a colorable argument that those exemptions apply to some coordinator positions. *See* Opp'n at 7 n.8 (collecting job descriptions with managerial tasks). But because the Court finds Castillo is not similarly situated to putative collective members with respect to the learned professional exemption, the Court does not consider this argument.

where he spoke with study coordinators outside his department who "described schedules and duties nearly identical" to his. *Id.* ¶ 12.

E.M. states that he worked as a study coordinator in a different research department from 2018 through 2021.[8] E.M. Decl. ¶ 2. His declaration closely resembles Castillo's. He states that he had the same job duties as Castillo (*e.g.*, collecting and entering data, maintaining research materials, *etc.*). *Id.* ¶ 3. He states that he worked in the same department as other study coordinators, whom he observed performing the same duties. *Id.* ¶¶ 5–6. And he states that he attended departmental meetings, appreciation events, and informal gatherings where he spoke with coordinators outside his department about their work. *Id.* ¶ 9.

These declarations cover a tiny subset of the proposed collective. They do not support that the hundreds of coordinators across defendants' hundreds of research studies are similarly situated to Castillo. Castillo's declaration names only three coordinators whose work he personally observed or with whom he spoke about their work, and each worked in the same laboratory wing as Castillo.[9] Castillo Decl. ¶¶ 7–8. E.M.'s declaration does not name any coordinator with whom he worked or spoke.

These declarations do not permit the Court to find that coordinators on 850 research studies—across the College's 30 academic departments, 10 centers of excellence, eight research centers, and six programs of distinction, Ramirez Decl. ¶ 4—had similar job requirements and

---

[8] Defendants argue that E.M. is not a member of the proposed collective because, they represent, he was a study supervisor, and not, as he claims, a study coordinator. Sur-Reply at 2; *see also* Dkt. 109-2 (E.M.'s offer letter for position of study supervisor). Because the Court finds that Castillo (even crediting E.M.'s declaration) has not carried his burden on this motion, the Court has not reached that argument.

[9] In his deposition, Castillo stated that those three individuals were the *only* coordinators whose work he observed during his employment. Dkt. 94-52 ("Castillo Dep.") at 32–33.

duties to Castillo and E.M. Nor do Castillo and E.M.'s sparse accounts of informal social conversations with coordinators who worked outside their particular workspaces. *See* Castillo Decl. ¶ 12 (at community events, coordinators "talked about our studies, the types of participants we worked with, and our work hours"); E.M. Decl. ¶ 9. These accounts are notably lacking in detail, including as to the names of the coordinators with whom Castillo and E.M. spoke, the departments or studies in which these coordinators worked, or when those conversations occurred. They do not support that members of the proposed collective who worked outside of Castillo and E.M.'s departments were subject to similar employment practices. *See, e.g.*, *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 665 (S.D.N.Y. 2013) ("statements are deemed 'conclusory' where they fail to identify particular employees or make specific allegations"); *Sanchez v. JMP Ventures, L.L.C.*, No. 13 Civ. 7264, 2014 WL 465542, at *2 (S.D.N.Y. Jan. 27, 2014) ("unsupported assertions and conclusory allegations" in declaration that failed to "provide *any* detail as to a *single* such observation or conversation" insufficient to support conditional certification (emphasis in original)); *Fernandez v. Sharp Mgmt. Corp.*, No. 16 Civ. 551, 2016 WL 5940918, at *3 (S.D.N.Y. Oct. 13, 2016) ("plaintiffs' affidavits do not have the specificity and detail that our caselaw requires to extend conditional certification beyond their own job title").

At most, these declarations show that coordinators in two departments had the same primary duties, consisting of data entry and administrative tasks. But they do not support Castillo's sweeping bid for conditional certification of a collective of hundreds of coordinators spanning defendants' numerous academic departments and research institutions. *See, e.g.*, *Guillen*, 750 F. Supp. 2d at 477 ("that [managers] were responsible for performing non-exempt tasks . . . in nine stores . . . out of 820 stores nationwide, provides little basis to believe that

[plaintiff] is similarly situated to [managers] throughout the country"); *Jenkins*, 853 F. Supp. 2d at 324 (denying conditional certification of collective of employees across defendant's New York stores where plaintiff offered "only his own deposition testimony describing his personal circumstances at the stores at which he worked"); *Brown I*, 252 F. Supp. 3d at 266 (evidence "too thin to satisfy their modest burden" where plaintiffs sought certification of 1,100-person collective based on "cookie-cutter declarations" as to personal experiences of nine people); *see also Hamadou*, 915 F. Supp. 2d at 666–67 (declarations relaying conversations with employees at Queens and Bronx locations supported conditional certification of collective of employees at those locations, but not others).

### 2.    Job Descriptions

Castillo also relies upon six job descriptions (the "descriptions") for study and research coordinator posts. Each sets out the coordinator's responsibilities and qualifications. Although the listed responsibilities vary across the descriptions, certain tasks are common. The job descriptions state that coordinators will work with the PI to implement, update, and/or develop study protocols; oversee or assist with recruitment of study participants; perform and/or manage data collection; assist with preparation of grant proposals; and manage the day-to-day operations of the study. Dkts. 87-5–87-10. As to educational background, the descriptions require a bachelor's degree but do not specify the type. *Id.* Castillo argues, based on these descriptions, that it can be inferred that all coordinators had the same primary duties—which did not require them to exercise discretion or independent judgment—and were not required to possess bachelor's degrees in fields keyed to their positions. Mot. at 10–11.

Castillo's arguments, however, are strongly undermined by the 49 job descriptions that defendants offer in opposition to conditional certification. Dkts. 94-2–95-50. As developed

16

below, those reveal that coordinators' duties and job requirements varied from one position to the next in multiple ways that bear on application of the learned professional exemption.[10]

First, coordinators exercised different levels of discretion. The duties of some, such as Castillo and E.M., Castillo Del. ¶ 3; E.M. Decl. ¶ 3, were largely mechanistic—collecting and entering study data, scheduling participant visits, assisting with regulatory documentation, and setting up equipment. *See, e.g.*, Dkt. 94-43 ("data collection" and "clerical and technical support"); Dkt. 94-50 ("data entry for databases" and "creation/maintenance of database"); Dkt. 94-6 ("data collection" and "[i]mplement study protocols"); Dkt. 94-40 ("[m]aintain IRB protocol" and "[c]ollect on-site clinical and demographic data"). Such positions entailed carrying out plug-and-play tasks that by nature do not appear to have required coordinators to exercise independent judgment.

The duties of other coordinators, in contrast, included designing studies and making medical recommendations. *See, e.g.*, Dkt. 94-5 ("refine and finalize research protocols, draft study questionnaires"); Dkt. 94-23 ("study design"); Dkt. 94-37 ("analyze clinical and population-level data on health indicators and outcomes"); Dkt. 94-41 ("[a]ssist in devising clinical programming for patients" and "strategies to re-engage patients in their care"); Dkt. 94-

---

[10] Castillo correctly notes, Reply at 11, that the learned professional exemption turns on how employees actually worked, not the duties stated in their job descriptions. *See Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 42 (S.D.N.Y. 2012) ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description." (citation omitted)), *aff'd*, 759 F.3d 235 (2d Cir. 2014). But the job descriptions are relevant evidence on that point—as Castillo's submission of six job descriptions reflects—and thus are fairly considered in assessing how the coordinator positions compared or contrasted. In addition, the job descriptions directly bear on whether the position in question meets the exemption's "specialized intellectual instruction" requirement. *See, e.g.*, *Young*, 586 F.3d at 203, 206 ("undisputed evidence," including job description, showed "no advanced educational training or instruction" required); *Sethi v. Narod*, 974 F. Supp. 2d 162, 183 (E.D.N.Y. 2013) (considering whether "the job description of Plaintiff's position" required advanced education).

12 ("recommend [] the available trial options for a patient that may have exhausted all standard treatment options"); Dkt. 94-21 ("[c]onduct medical chart reviews"). Because these duties required the coordinator to "analyze, interpret, or make deductions from varying facts or circumstances," 20 C.F.R. § 541.301(b), coordinators in these positions more likely qualified for the exemption.

Second, coordinators' duties involved differing levels of intellectual rigor. For example, some coordinators were entrusted with preparing and delivering presentations at conferences, contributing to academic articles, conducting literature reviews, and representing the study at academic meetings. *See, e.g.*, Dkt. 94-25 ("preparation of conference abstracts, oral presentations, and poster presentations, and . . . development of manuscripts for publication"); Dkt. 94-3 ("[a]ssist with writing sections of research papers for publication and conference presentations" and "contribute to future research proposals"); Dkt. 94-9 ("[a]ssisting PI with editing research articles" and "[p]erforming literature searches"). Others, in contrast, did not perform meaningful scientific research work or have responsibility for generating written work. These coordinators were primarily tasked with administering studies and collecting data that served as the basis for reports, publications, and presentations. *See, e.g.*, Dkt. 94-50 ("[c]oordinate and oversee/audit quality of data entry"); Dkt. 94-48 ("[t]rain participants" and "[s]core and enter appropriate data"); Dkt. 94-43 ("[a]ssist with organization and maintenance of documentation of participant and study data"). The "intellectual character" of coordinators' work thus varied by position.

Third, the coordinator positions required differing levels of education. Some positions required a bachelor's or master's degree in a germane science or health field, while others (like those covered by the handful of descriptions offered by Castillo) required a bachelor's degree but

18

did not specify a particular field. *Compare* Dkt 94-9 (requiring bachelor's degree in biology, neuroscience, or related field), Dkt. 94-14 (same in psychology, neurobiology, or behavioral science), Dkt. 94-21 (same in public health, clinical epidemiology, or related field), Dkt. 94-48 (requiring master's degree in public health, epidemiology, or related field), *and* Dkt. 94-42 (same in psychology or related field), *with* Dkt. 87-5 (requiring bachelor's degree in any field), Dkt. 87-6 (same), Dkt. 94-46 (same), *and* Dkt. 94-49 (same). The former category of coordinators would likely satisfy the "specialized intellectual instruction" requirement, but the latter likely would not. *Pippins*, 759 F.3d at 249–50 (a "bachelor's degree in a germane field suffices," but "generic non-specialized educational requirements" do not).

Castillo responds that any differences between coordinators are "legally irrelevant at this stage." Reply at 11. That is wrong. At the first stage of conditional certification, the Court must find that there are employees who are similarly situated "with respect to the[] job requirements . . . on which the criteria for many FLSA exemptions are based." *Myers*, 624 F.3d at 555 (citation omitted). That requires assessing differences between coordinators' positions that bear on whether the learned professional exemption was correctly applied to them. *See, e.g.*, *Fraticelli*, 2014 WL 1807105, at *2 (denying collective certification due to "significant differences . . . among the interns in terms of the activities they performed"); *Brown v. Barnes & Noble, Inc.*, No. 116 Civ. 7333, 2018 WL 3105068, at *19 (S.D.N.Y. June 25, 2018) ("*Brown II*") (same where "variations in stores, including the practices of individual Store Managers, may have influenced the [employees'] duties and responsibilities").

Because coordinators' duties and educational requirements appear to have "var[ied] greatly from one department to the next, in ways . . . highly relevant" to whether the exemption was properly applied, the job descriptions undercut the claim that coordinators were subject to a

common policy of misclassification. *Fraticelli*, 2014 WL 1807105, at *2; *see also Brown II*, 2018 WL 3105068, at *19 (no "factual nexus" supporting conditional certification where employees' duties varied by store location and evidence did not support that plaintiff and putative collective members all performed primarily non-exempt duties); *Vasquez*, 2011 WL 2693712, at *4 ("while the balance of work responsibilities for [managers] at some retail locations may possibly support a finding of misclassification, in others the balance may tip in the opposite direction").

### 3.    Ramirez's Deposition Testimony

Castillo also relies on excerpts from Ramirez's deposition testimony. Salient here, her testimony addressed the duties and requirements for coordinator positions. As to duties, she stated that a study coordinator's role typically includes: "working with [the] Institutional Review Board," "design[ing] and implementing research protocols and amendments," and "preparing reports [and] presentations." Ramirez Depo. at 147–48. She stated that coordinators interact and communicate with study patients and input the relevant data afterward. *Id.* at 150. She stated that some coordinators are "involved in grant writing" and in "published research." *Id.* at 148. She stated that the "PI ultimately is responsible for the [study] protocol," that study coordinators might assist in revising the protocol, and that their level of involvement "depends from PI to PI, study to study." *Id.* at 149. As to educational requirements, Ramirez stated that a bachelor's degree is the "minimum qualification," but that it is "not [] likely" that a coordinator would be hired with only a bachelor's degree. *Id.* at 151–52. She stated that "it depends on what the bachelor's degree is in," and "the person needs to be able to demonstrate advanced knowledge, scientific knowledge, or . . . knowledge of psychology." *Id.* She stated that "each position is different" because "[e]very PI has a different expectation." *Id.* at 153.

Ramirez's testimony, if anything, further undermines Castillo's bid for conditional certification. Her testimony depicts a decentralized landscape of coordinators performing duties that vary based on the nature of the study and the preferences of the PI. She testified that *some* coordinators perform more substantive tasks such as grant writing, publishing research, and preparing reports and presentations, while others do not, and that the level of coordinators' involvement in the design of study protocol varies from "study to study." *Id.* at 149. And she described educational requirements that, much like coordinators' job duties, vary from one position to the next, depending on the PI's needs and expectations.

Castillo argues that Ramirez's testimony shows that coordinators had the same primary duties—"to carry out and facilitate studies designed and directed by the principal investigator"— and that coordinators exercised discretion and judgment only when "offering minor feedback on the logistics or implementation of a study." Mot. at 10–11. That mischaracterizes Ramirez's testimony. She did not testify that coordinators principally implement study protocol. Rather, she listed implementing protocol as one task of a coordinator, along with others. Her testimony also cannot fairly be read to imply that coordinators' involvement in protocol design was limited to minor revisions. Although she stated that coordinators "may have a hand" in such revisions, she also stated that coordinators were involved in "design[ing] . . . research protocols and amendments." Ramirez Dep. 147–49.

At bottom, Ramirez's testimony highlights the widespread variation from study to study and department to department. It does not support conditional certification of a collective of coordinators across studies and departments. *See, e.g., Brown II*, 2018 WL 3105068, at *19 (variations across stores "underscores the likelihood that [employees] are not all similarly situated as to an alleged common FLSA violation").

### 4.    Overall Assessment

Based on the foregoing analysis, Castillo has not met his burden of showing that similarly situated plaintiffs exist.  On the contrary, the evidence affirmatively supports that coordinators' duties and job requirements differed depending on factors such as their PI, area of study, and department.  These differences suggest that some coordinators were properly classified as learned professionals, while others were not.  Castillo thus has not shown that the putative collective members were victims of a "common policy" of misclassification.  *Myers*, 624 F.3d at 555.

Accordingly, the Court denies Castillo's motion for conditional certification.[11]  *See, e.g.*, *Fraticelli*, 2014 WL 1807105, at *2 (finding "[p]laintiffs have not met their low burden" where "interns have worked in approximately [100] different departments, and their experiences appear to vary greatly from one department to the next"); *Lock*, 2025 WL 964148, at *5 (same where plaintiffs failed to "provide[] enough factual support that other Junior Managers' overtime-exempt status is a misclassification"); *Vasquez*, 2011 WL 2693712, at *3 (same where plaintiff's "evidence of misclassification . . . consist[ed] of allegations regarding the tasks performed by specific individuals, based on his observations of and conversations with six" employees at small subset of store locations); *Brown I*, 252 F. Supp. 3d at 267 (same where plaintiffs' evidence was

---

[11] The Court considered whether conditional certification might be appropriate as to a narrowed subset of Castillo's proposed collective. *See Kwan v. Sahara Dreams Co. II Inc.*, No. 17 Civ. 4058, 2021 WL 2843100, at *3 (S.D.N.Y. July 7, 2021) ("courts within the Circuit routinely certify a collective of a narrowed scope").  Castillo, however, has not proposed an alternative collective, and on the present record, the Court is unable to discern the parameters of one that would be legally sustainable.  In many cases, a collective can be narrowed "to the job category to which the named plaintiff belongs." *Id.*  Here, however, there are only two job categories— study and research coordinators—and the parties appear to agree that any differences between the two are trivial.  Mot. at 4; Opp'n at 1.  In addition, the evidence supports that the variation in duties and job requirements chronicled above—which the Court has found to defeat certification of the proposed collective—would defeat a collective of either subset, including study coordinators (the category into which Castillo falls).

"insufficient for the Court to find a factual nexus between [p]aintiffs' personal experiences" and those of potential plaintiffs).

With the Court having denied conditional certification, it also denies Castillo's requests for: (1) equitable tolling to preserve the rights of opt-in plaintiffs, for whom the FLSA limitations period continues to run until their filing of a written consent opting into a suit, *see, e.g., Becerra v. IM LLC-I*, No. 14 Civ. 2671, 2016 WL 8968978, at *8 (E.D.N.Y. Feb. 20, 2016) (denying equitable tolling request without prejudice where court denied conditional certification motion), and (2) authorization of notice to current and former employees dating back three years and expedited disclosure of the names and contact information for those individuals.  Mot. at 13–16.  These rulings are without prejudice to Castillo's right to pursue further relief of this nature, and to the right of individual plaintiffs, notwithstanding the denial of the collective certification motion, to opt in to this lawsuit.  *See Myers*, 624 F.3d at 555 n.10.

## CONCLUSION

For the foregoing reasons, the Court denies Castillo's motions for conditional certification, equitable tolling, and notice, all without prejudice.

All deadlines related to defendants' anticipated motion for summary judgment remain stayed pending mediation.  *See* Dkt. 116.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 73 and 74.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 26, 2026
       New York, New York